Good morning, Your Honors. Keith Donahue of the Defender's Office. May it please the Court. Mr. Donahue, good morning. Time for rebuttal. Three minutes, please. Yes, sir. Your Honors, in this case, Pennsylvania State Troopers marched into what is supposed to be the most secure and private space protected by the Fourth Amendment, the home itself. They did so without a warrant. They did so without any reason to believe there was anyone inside, much less anyone dangerous. And nothing made it imperative for them to enter the home immediately. Simply put, this was a warrantless search without consent, without exigency, and without even so much as reasonable suspicion. The undisputed facts of this case are these, Your Honors. Dispatch received a call reporting that there was an older, intoxicated gentleman apparently threatening his daughter with a firearm inside his home. The caller to dispatch relayed that the information he was reporting came from the daughter herself, who was texting information and who asked him to call the police. When two troopers responded to the he was telling Samantha that there was someone outside trying to kill him. I don't believe it's clear whether the person calling dispatch spoke with that level of detail, but he did say that there was a man inside the home waving a gun around erratically, that he may have barricaded himself inside a bathroom, that he was frightening the daughter, that he may have been endangering her, and that the circumstances were very volatile in that respect. You didn't answer my question. Wasn't he also saying to Samantha, his daughter, that there was someone outside trying to kill him? Oh, I'm sorry. Well, yes. The father did apparently say that to his daughter. So there was this, if nothing else, there was this mysterious third person. But I don't believe that information was reported to the police, Your Honors, is my submission, that the caller to dispatch did not relay any suggestion on the daughter's part that she feared that her father thought someone was outside trying to kill her, just that he was waving a gun around and frightening her. When the police did arrive, what they saw was two individuals looking out from inside the front door of the home. And they commanded those individuals to exit, which both did immediately. One was an older man, and as he appeared to, as he began to walk toward the officers, his balance was poor, his motor skills appeared to be impaired, and so officers took him to match the report of an older male who was intoxicated. The younger woman who came out of the home was about the right age to be his daughter. The officers had the older man walk about 20 feet away from the home, asked him to lie face down on the ground, handcuffed him behind his back, and then secured him at the very far edge of the yard next to their cruiser. They found it unnecessary to place him inside their cruiser. At that point, he apparently engaged in polite conversation with one of the troopers to whom he provided his name, other biographical information, and even responded to inquiries about a motorcycle in the garage. At all points throughout this Trooper Hoban, one of the two troopers who had arrived, then approached Samantha White, the younger daughter, and asked her whether anyone was inside the home. She replied that there was not. At this point, he noticed that Samantha White appeared shaken, so this was another piece of information corroborating the report the troopers had. Now, on this totality of circumstances, at this point in time, Trooper Hoban elected to march right up to and into the home in order to investigate its interior. What was the visibility like? What time of day was this? This was at between midnight and 1 a.m. in the morning. The record is quite discrepant as to exactly what the visibility was at the front door. Trooper Hoban, the one who went inside, said it was dark. At another point, he said he did think a light was on inside the house somewhere. His colleague, Trooper Hill, initially described the front door as having been fairly well illuminated. In response to another question from the district court, he said it was very well illuminated. There's contradictory testimony in the record as to exactly how well illuminated it was. But what there's no dispute as to is that as Trooper Hoban crossed that curtilage, walked up to the front door, and stepped into the home, he discovered two guns that were beyond the threshold of that home, which he seized unlawfully and brought back to his cruiser, thereby making their recovery known to Mr. White. Did he see the guns as he walked towards this area called the mudroom or adjoining area? Or did he see the guns when he stepped inside? The record is also not perfectly clear on that, Your Honor. I would submit that the gist of his testimony is that he saw the guns as he was walking into the home. That's the closest I've got. As he was walking. As he was walking into the home, which is also consistent with his prior statement two days after the incident when he said, I entered the home and saw the guns. Now, he gave other testimony that was that he was still outside the home when he saw the guns. I guess his most precise testimony in response to leading questions from the district court was that he was about three feet away from the home at the distance of a wheelbarrow that can be seen in Government Exhibit 1 at page 147 of the appendix. So he did say at that point in his testimony, contradicting what he'd said elsewhere, that he was outside the home. What we don't have is any testimony as to whether he was standing those three feet away after having just opened the door to look inside. So ultimately, the record... Let's assume for a second that at three feet, he said he saw the guns. Let's assume for a second. Under your argument, could he have gone in and seized those guns without a warrant? No. And he could not have done so under... So it doesn't make any... Under your theory of the Fourth Amendment as it applies to these guns, while he was outside the home, he could not have seized them without a warrant. That's right. That would still have involved a warrantless entry into the home, a lawful other. He may have been able to stand on the... No. That would also be a warrantless entry. Stand outside and reach in. As long as he reached in... Only perhaps, arguably, if he had a magnet to pull them out from outside. Okay. So as long as he reached in... As long as he reached in. As long as he reached in... As long as... But incidentally, he said he stepped in. I understand. Even if he had reached with his hand in... I understand. I was trying to understand what your argument is. But the district judge made a finding, a finding of fact that the police were entitled to look at the immediate area, the area immediate to the arrest, for their safety. Was there a clear error there? To the extent that was a finding of fact, yes, there's clear error because it's flatly contradicted by the well-established law of this court, of this court held in Shirar v. Felsing, that whenever an arrest is made just outside the home, and certainly as far away from the home as here, that any space that lies across the threshold of the home is not immediately adjoining, period. That is the holding of Shirar v. Felsing. So were we to look at this as an issue of fact, which I don't think is the most felicitous way of looking at it, were we to look at it that way, it would be clear error, Your Honor. Yes. If you're correct that Shirar controls and that we can't decide this under Bouie Prong 1, but yet that's what the district court did, is there enough of a record for us to decide Bouie Prong 2 and exigent circumstances? Yes, there is, Your Honor, and let me try to explain why. What we know from the record here is that Mr. White was arrested outside the home and secured more than 20 feet away. So we've got the test under Shirar being was there reasonable suspicion to believe that someone inside the home posed a danger. The facts on that are enough to affirm. To begin with, the troopers testified they did not have reasonable suspicion. You don't want an affirmance, do you? I'm sorry to reverse. Thank you, Your Honor. A key point to begin with is the troopers' own testimony. They didn't claim to have reasonable suspicion. They said they went into the home to make sure there was no one inside. They weren't investigating a suspicion. They were trying to verify what they believed to exist. And as the court said in Shirar, to quote, no information, i.e., having no information, cannot be a basis for a protective sweep that requires information to justify it in the first place. They had reason to believe that there was a firearm, at least one firearm in the home. Isn't that fair? That's fair. So does it follow that any individual in the home that was unaccounted for would pose a potential danger given the belief that there's a firearm? Yes. But just before I address that question very immediately, I want to make a crucial point to us, that is that it would not be reasonable to believe there was any other person inside the home. If you did have a circumstance where there was an unknown person inside the home and a loose firearm, I would suggest that perhaps that would be enough to support a protective sweep. Unless facts known to the officers compelled the conclusion that whoever that individual was would not or could not use the gun to investigate. So why isn't the fact that the report here came in from a third person, why isn't that enough to create at least a reasonable, articulable belief that there could be someone else in that home? Under the facts known to officers, it would have been unreasonable to infer, believe, to guess that that third party was inside the home. That would be flatly unreasonable. First of all, the district court made an implicit factual finding that the person was not inside the home. And the reason that's obvious is because he said he was relaying information by text. So first of all, if he'd been inside this small home, it's unthinkable that he wouldn't have also had personal information to report, i.e., there's a man running around in the next room, i.e., I hear my girlfriend screaming. That's one reason he couldn't have been in the home. The other reason is that it's not plausible to believe that if he was in the home, that the daughter, Samantha White, would have been communicating with him exclusively by text. So the district court's implicit finding comes in its remark near the end of the transcript where it cites the fact of a text message as significant, but it does so because it says that means he couldn't have called. That means there couldn't be telephone communications between Samantha and this third party. So I would submit that implicit in that is that he's not in the home. Furthermore, one of the troopers, Troopers Hill, testified that it was his understanding that this third party had been contacted in some way by Samantha, again indicating the belief that he was outside the home. I see my time is up. Thank you, Mr. Donohue. Thank you, Your Honor. Mr. Shapiro. May it please the Court, my name is Paul Shapiro. I'm an assisting United States attorney. I represent the United States in this case. To understand this case, first of all, the district court concluded that these two state troopers acted in an exemplary fashion. They were indeed confronted with a situation that was, in the words of the district court, fraught with danger. And they acted to ameliorate that danger in a way, as the district court concluded, that was absolutely respectful of and consistent with the Fourth Amendment. Understand, they were called to what was described to them on the radio as a domestic situation. The facts were not known. They were not acting in a courtroom, lighted, heated, safe. They were acting under the focus of the particular facts as they were unfolding and as they were changing before their eyes. That's always the common scenario, isn't it? It is the common scenario, although some scenarios the facts have happened and the police are coming on the scene and they know what the facts are. Others, the facts are changing literally right before their eyes. So what do you do in this case where they have this information in advance of the father dragging the daughter in the inside of apparently a trailer home? Now the officers arrive and they take them outside and at least 20 feet they've got him, the primary suspect, in handcuffs. And she is outside also. So both of the participants are outside and yet in handcuffs, immobilized essentially, they go inside. Or one of the officers goes inside. Now at some point the Fourth Amendment has a role here. It absolutely does have a role. And that tension is really what motivates many, many of the Supreme Court cases. Bowie, for one, is very, very practical. It deals with the practicalities of arresting individuals. Wasn't Bowie, I can't remember the facts, was it an in-home situation? It was in-home. Oh, it was clearly in-home and it was dealing with the dangers. And that's a very unique set of circumstances because you don't know what lurks around the corner. But this is very different because the officers were outside. Well, except that the corner that's lurking in this case is that front room of the trailer. And in the same way that an officer arresting an individual in that individual's home is on unfamiliar turf, they're on unfamiliar turf standing five feet, which is where Samantha was, from the front door of a trailer where there's been report of a man with a gun. Understand, too, that Bowie is dealing with a very practical situation, that facts often are not what they're believed to be. You have, as an officer responding, you have a whole pile of information. Isn't Sharrar the important case in this scenario? I mean, if we apply Sharrar, what is your position? Well, Sharrar says what the defense says it says, which is that you use Bowie, prong two, for an arrest outside the home. We believe that is dictum because it's far from clear whether on the facts of Sharrar they even, prong one, was even a possibility. So that may have been just simply the facts driving that decision, and the case may not stand for that proposition. And, indeed, in Latz, this court did not treat Sharrar as controlling. And, indeed, there are cases from other circuits cited in our brief dealing with the situation of Fourth Amendment protected areas in which courts, other circuit courts like this court in Latz, have concluded that, yes, you may apply Bowie to an arrest just outside the home, as long as the area that you're looking at is, number one, immediately adjoining, and, number two, a place from which an attack could immediately be launched. Could you explain how it was immediately adjoining? When you say immediately adjoining, you mean adjoining the defendant in the case who was in handcuffs. Is that fairly accurate? I think what you mean is immediately adjoining the — Well, I want to get to what you mean there. Immediately adjoining when — and that was a finding of fact by the district court. It was a finding of fact, although its character is one that is both legal and factual, because there are fact findings that underlie it, and you're applying the law to immediately adjoining. What do you do when the primary suspect is handcuffed, completely immobilized, and the other person is apparently of no threat? Well, you're making — Are you allowed to then go into the home, into this area called a mudroom or a porch without a warrant? If the facts were as Your Honor states them, the answer might very well be no. But you have to remember that the facts which we now know them to be, which is that the primary suspect was handcuffed and immobilized, and that the secondary suspect was no — or the secondary individual was no threat, are facts that we now know but those officers did not then know. But the officers clearly didn't view Samantha as a threat. They never put her in cuffs, and they invited her to come into the home with them. They — well, number one, that doesn't necessarily follow that she wasn't a threat. The alternative is leaving her — Well, the officer testified, didn't he, that he didn't see her as a threat? He said he didn't see her — he said he did not see her as an immediate threat, given her size. But that doesn't mean that that's not subject to change. And in the case of domestic violence victims, it often does. That people who start out as no threat and as the victim change character, and all of a sudden when they realize that their loved one is being arrested rather than just removed, they do become a threat. It is a situation that is subject to change. Likewise, when the officers arrive and there are two people, the best analysis, the conclusion that they leap to, is that this is probably the perpetrator and probably the daughter. But they don't know that for a fact because, as the district court found, they don't know Samantha and they don't know White. They don't know for sure that the report of a man barricaded with a gun in a bathroom is these two, that he's unbarricaded. They had seen nothing inconsistent with that report at the time they entered the home. Isn't that correct? Well, no, that's not correct. They're told it's man with gun. They have man without gun. They're told that if it's White, who's the man with the gun, that he is violent and unpredictable and has gotten into fights with the state police. They get man without gun, and that man without gun is absolutely passive and absolutely compliant. The one who's not compliant is Samantha. She's ordered away from him and does not comply, suggesting that her alliances are, if not shifting, certainly undecided, that she does not respond to the state police the way you would expect a victim to do. And in any event, her reliability is unknown. They also know that the information that they're given is a pass-down-the-lane kind of information. Anybody who's played the telephone game as a child knows by the time it gets to the third hand, it has lost things and it has picked up things. So they do not, and they say in their testimony in the district court, we don't know what happened. We don't really know who these people are. Did any of this figure into the district court's decision in this case? I think legally the answer to that is no. I didn't think so. I don't remember reading that as a rationale for the district court's decision to allow the search in this case. Well, I agree with you to the extent that it's clear that the district court made its decision on Buoy Prong 1. But it's also quite clear when you read the district court's opinion that the court was at pains to note that the dangerousness of the situation, the legitimate concern that the troopers had for safety, so that while I agree with you that there is no finding on reasonable suspicion, the district court was certainly well aware and very concerned about the fact. There were no findings as to exigent circumstances either, right? There were not findings because the district court relied on this court's opinion in lats. The essence here was that the officers were entitled under the circumstances to search the immediate area of the arrest. That was the basis for the district court's decision. Is there anything to suggest that they didn't believe that they had Mr. White in custody? They say they were not sure. I think they didn't they suspected that they did. I think that, like the defense, if you had stopped them while the process was unfolding and said, what is your best guess as to who you've got and what's going on, they would say, I suspect this is White and this is Samantha. Sometimes it seems that we are imposing unnecessary burdens on law enforcement officials, especially when their safety is of concern to them. But actually what it seems like it requires here is to get a warrant over the telephone, which doesn't take very long at all. Is that fairly accurate? I wouldn't say that it's required in these circumstances because I don't think you would ever agree with that. But I'm speaking practically in terms of experience. What does it require to get a warrant? Could they just not call it in? Number one, no, you can't simply just call it in. Well, if somebody is on duty to take, you know, these immediate emergency types of applications, why couldn't that happen? Well, there's two answers. One is the very practical answer, which is, as I say, they were told that there was man barricaded in bathroom with victim. If they took the time even to cross-examine the people who they have to get identification, to find out who they are, to get their story straight, it may well be that if that person is still in the barricaded situation, that person may be killed. Or somebody may have already been hurt. And in fact, the trooper was very clear that when asked why he went in, he wanted to see if there was somebody who needed medical attention. It was clear that in his mind, one of the possibilities was, I don't have the players all right, or there is a third party on the scene who is unaccounted for. And in order to do that, to go through the business of a telephone warrant means you have to locate the judge. So it's now 1 o'clock in the morning. You're going to have to wake a judge up. The telephone warrant, as Charar itself makes clear, you're supposed to have a duplicate original. You're supposed to write down all of the information on both sides of the telephone. The judge then instructs the officer to sign the duplicate original. It's in fact a long and involved process itself.  But that doesn't make it, you're not talking seconds or the couple of minutes that he needed to go in and make sure that there's nobody dying or about to die on the floor. Or indeed, that while they're out five feet away talking to Samantha and 20 feet away talking to White, that there's not somebody in the house who's got the gun, which as Judge Stark pointed out, they know to be missing. Well, that's why I sort of ask, first I ask Mr. Donohue, there was at least a report about a third person. There was, and Your Honor is absolutely correct. It's paragraph 12 of the PSR. And that paragraph makes it clear that the reports that were being provided to the state police by the third party included the fact that the victim said that the father thought somebody was trying to kill him. But that was not part of the district court's finding. It was not, and not only was, in fairness, it not only was not part of the district court's finding, it was not part of the trooper's testimony at the time. Okay. The parties relied on it at sentencing and in advance of sentencing. And it was part of the government's statement of the factual basis at the time. If we think that Sherrar does control here and that Bouie-Promont isn't available, shouldn't we just remand it so the court can consider making findings on reasonable suspicion in exigent circumstances? I think that that would be an appropriate course because there are issues, there are fact issues that the defense says are unclear from the record. For example, the – And at that point, whether or not there was a threat to the defendant and whether the officers knew that or that was part of the totality, that might be made part of the record. That very well might be, as well as the three-feet business, by the way. It's paragraph – it's page 103 of the appendix. And the officer is very clear that he sees the guns before he ever gets in the house. He's three feet away, the approximate distance of a wheelbarrow. But Mr. Donahue said it really didn't make any difference as far as the argument they were making, is even if he saw them three feet away, he couldn't go in without a warrant under these facts. Do you disagree with that? I do disagree with that. It would not be – the plain view doctrine would not permit it because the plain view doctrine requires that you be in a place from which you can legally seize it. And he was not at that point. But that doesn't mean that it wouldn't – that that information would not get folded into the exigent circumstances. But there's no finding on that. There is no finding on it. That's quite true. There is no finding on that. You know, it wasn't raised in this case, but you're familiar with the area. You know, the Supreme Court in the last session in Florida versus Jardines, are you familiar with that case? I am, the dog. The dog sniffing on the threshold? Yes. They've taken another step to sanctify the threshold of a home in that case. Your Honor, I don't think there's any doubt that the threshold of a home, which is where these officers were entitled to be, understand. Right. Because they're securing the victim. They've been called to the premises because of an ongoing domestic violence situation involving a handgun. But the problem is here, the facts show they got to a point 20 feet away. Well, no, that's not quite correct. The defendant got to a point 20 feet away. And Samantha was? Samantha is between 5 and 10. 5 and 10, okay. And to say that when you have two people come out of a house at gunpoint, that the officer can't approach. So he's entitled to be within 5 feet of this home. So the crux of what I'm getting to, and you helped clarify it, is the real question is whether from 5 to 10, that range, from 5 to 10, what rights do the police have under Bowie, either prong one or prong two, to make a sweep of the home? The rights are different under the two prongs. Right. Under the first prong, if some part of the home is immediately adjoining, then under the compelling logic of Bowie, I mean, there is no reason to think that standing outside the front door, within 5 feet of a home. So you would argue, though, that that's the vantage point from which we should analyze Bowie Part 1? Because that's where the officers are at the time that he has to make his decision. But if we go to Bowie Part 2, we have to analyze the facts, which may be on this record insufficient for us to make a determination. The facts may very well be insufficient on this record. There are certainly indications that the state police were made aware, and indeed went out over the radio, as it indicates in the PSR, that there were at least claims that there was a third person. There also was, they knew, by the way, that there was a third person. They knew that there was somebody relaying them information. They didn't know where he was. They didn't know if he'd arrived in the 15 minutes that it took them to get there. They didn't know if he was the same person that the person in the house thought was trying to kill him. They didn't know if the person that was trying to kill him was a fantasy, which is what it turned out to be. But this was not part of the judge's decision, was it? It was not part of the judge's decision, because the judge relying on laughs didn't think he needed to go that far. Okay. Mr. Shapiro, thank you very much. Mr. Donohue. Thank you, Your Honors. I want to first give several record sites for some points that are not in dispute. First of all, the officers did not regard Samantha as a danger. It's on page 82 of the appendix. Second of all, no one reported to officers, as Judge Fischer, your question originally pointed out, that Mr. White, believed someone was at the home to kill him. That information is not in officers' head at the time they're reporting to the scene. That comes out apparently from the discovery I have, not from anything in the record, from a statement Samantha makes about an hour later at the barracks, and that, as my friend has said, came out more at sentencing. But at the time that the officers responded, there's no information available to them that somebody's trying to kill Mr. White, nor that Samantha's a threat. The idea that it was reasonable for the officers to believe that someone was barricaded in the bathroom is also a gross distortion of the record. The closest thing we have to someone barricaded in the bathroom is one of the troopers saying, maybe he heard someone was barricaded in the bathroom. Numerous other statements by the troopers of what they heard was that a man was waving a gun around and moving his daughter from room to room. So it's not even perfectly clear anything about being barricaded in the bathroom was said. Now finally, the officers did not have any doubt in their mind that the people they were confronting who left the home were the older man who was reported to be the assailant and the younger woman said to have been his daughter. And I would refer the court in that regard to pages 132, which is Trooper Hill's testimony, and 101, which is Trooper Hoban's testimony where he says that what he encountered at the residence was exactly consistent with the information reported to dispatch. For all these reasons, Your Honors, there is no call, there's no warrant, and there's no propriety in ordering a remand here. Just to make the point as plainly as possible, Sherrar states that a sweep incident to an arrest occurring just outside the home must be analyzed under the second prong of the buoy analysis. The district court said that this situation was fraught with danger. What standard of review do we apply to that finding? A clearly erroneous standard. Is it clearly erroneous? Yes, it is. It was not clearly erroneous at the time the officers arrived at the scene. At the time they crossed the threshold. At the time they made the search, it would be clearly erroneous. It's clearly erroneous to find at that moment that it was a situation fraught with danger. That's right. Even though they don't know what's in the house. Even though they have no information that anyone is inside the house. That is what's required. They're not allowed to walk inside the house to make sure they're right, there's no one there. And all the information known to them at the point they did that left them only with that narrow degree of uncertainty, which is not reasonable suspicion. Mr. Donahue, thank you very much. Thank you. Mr. Shapiro, thank you as well. Thank you both for excellent arguments. We'll take the case under advisory.